IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 9, 2004

## IN RE: T.A.R. AND D.F.R.

**Appeal from the Juvenile Court for Davidson County**
**No.'s 2119-64770 and 2119-64771     Betty Adams Green, Judge**

---

**No. M2003-02801-COA-R3-PT - Filed September 20, 2004**

---

The trial court terminated the parental rights of both Mother and Father, and both appealed. Because statutory grounds were proved by clear and convincing evidence and it was also shown by clear and convincing evidence that termination of parental rights was in the best interest of the children, we affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Kelli Barr Summers, Brentwood, Tennessee; J. Stephen Mills, Nashville, Tennessee, for the appellants, V.R.H. and B.R.

Paul G. Summers, Attorney General and Reporter; Juan G. Villaseñor, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Thomas H. Miller, guardian *ad litem*.

## OPINION

The guardian *ad litem* for the two children who are the subject of this action, T.A.R. and D.F.R., filed a petition to terminate the parental rights of Mother and Father[1] on May 30, 2003. As grounds, the petition alleged abandonment by willful failure to visit and willful failure to support, substantial noncompliance with the requirements of the permanency plans, and the persistence of conditions preventing the safe return of the children to the parents' home. The Department of

---

[1]Father is the biological father of one of the children, D.F.R. The petition also named Unknown Father as a defendant. Mother testified she did not know who the biological father of T.A.R. was because she had been raped. Father testified he had always considered both children to be his and that he had been present when T.A.R. was born.

Children's Services (DCS) filed an intervening petition to terminate on October 6, 2003, alleging the same grounds.[2]

These two children were originally removed from the custody of Mother and Father on October 9, 2001, when Mother and Father were arrested on outstanding warrants. The children, ages 2 and 3 at the time, were living with Mother and Father in a motel room that was unsanitary and filled with trash. The children were dirty, and both had on soiled diapers. The police found drug paraphernalia in a diaper bag. An agreed order was later entered regarding the removal and setting forth these facts. Mother and Father pled guilty to child neglect. In a subsequent agreed order, the children were found dependent and neglected due to the incarceration and drug use of Mother and Father.

Trial on the termination petition was held October 27, 2003, and the trial court terminated Mother's and Father's parental rights by order entered November 11, 2003.[3] In that order, the trial court recited the facts surrounding the children's initial removal from their parents and also found that the following had been proved by clear and convincing evidence:

> When the children were placed in foster care, they needed extensive dental work. Some teeth had literally rotted away and had to be extracted; many others were capped. [T.A.R.] had significant developmental delays and, while still developmentally behind her peers, she has made considerable progress in her behavior, attitude and communication skills. She continues to receive special education services.
>
> Initial permanency plans with concurrent goals of return to parent and relative placement were approved by the Court on December 14, 2001. In order to achieve reunification with the children, both [Mother] and [Father] were required to complete a drug treatment program, follow all recommendations of the program therapist, and submit to random drug screens; obtain stable housing; obtain stable employment; visit with the children at least four hours per month; and pay child support as the court deems necessary. In addition, [Mother] was required to actively participate in and complete parenting classes. Three subsequent revisions of the permanency plans all contained this statement of responsibilities.
>
> The guardian *ad litem*'s petition was filed on May 30, 2003. Neither parent has seen the children since July 17, 2002. On that day [Father] tested positive for cocaine after the visit. [Mother] had tested positive for cocaine on June 4, 2002. After the July 17 visit, the parents were told that they would have to submit to a drug test

_____

[2]The guardian *ad litem* had previously moved to join DCS, the children's legal custodian, and the court had granted that motion.

[3]Unknown Father's rights were terminated by order entered February 20, 2004.

before any more visits would be scheduled. On October 22, 2002 [Mother] informed the Department that she would not visit the children because she had an outstanding arrest warrant for violating the conditions of her probation and she would have been arrested. Both parents have been in and out of jail while the children have been in foster care, but they have never requested a visit. Accordingly, both parents have abandoned the children by their willful failure to visit.

The parents acknowledge that they have paid no child support while the children have been in foster care. [Mother] testified that she continually offered to pay child support and that DCS told her they would look into it. [Father] testified that paying child support crossed his mind, but he never paid. Ms. Clegg testified that the parents sometimes brought "toys and trinkets" to visits, but they did not bring birthday presents or Christmas gifts to the children. [Father] testified that he was gainfully employed at all times that he was not incarcerated. [Mother] was either employed or employable at all times that she was not incarcerated. Consequently, both parents have abandoned the children by their willful failure to pay child support or to contribute to their support.

The Court has approved four permanency plans while the children have been in foster care. Each plan contained the identical statement of responsibilities for the parents. The parents have not substantially complied with the plans' requirements. Specifically, both parents were required to complete a drug treatment program, follow all recommendations of the program therapist and submit to random drug screens. Both parents were required to obtain stable housing and stable employment. Both parents were required to visit with the children at least four hours per month and to pay child support "as the court deems necessary." [Mother] was required to actively participate in and complete parenting classes.

The Court finds that these statements of responsibilities are reasonable and related to remedying the conditions which necessitated foster care. [Mother] did complete parenting classes while incarcerated and [Father] has obtained stable employment, but none of the other requirements have been fulfilled. Neither parent has completed a drug treatment program nor submitted to random drug screens in more than a year. Since drug paraphernalia was found in a diaper bag when the parents were arrested in 2001, the Court gives this requirement great weight. Neither parent has visited the children in more than a year. The parents testified that they have lived in their current residence for three weeks and they lease it on a month-to-month basis. This does not constitute stable housing. The Court, therefore, finds that neither parent has substantially complied with their requirements under the permanency plans. [In a footnote the court stated, "Since the permanency plan states that the parents will pay child support 'as the court deems necessary' and since the Court never ordered the parents to pay child support, the Court is not considering this requirement in its substantial compliance analysis. The Court notes, however, that even though the

parents were not paying child support, they still did not accomplish most of the other tasks."]

According to the court-approved permanency plans, these children came into foster care because of "alleged drug use, criminal activity, and filth of the home." The parents admit that they have been in and out of jail while the children have been in state custody; [Father] has a theft charge pending now. Most serious, however, is both parents' continued drug use.

[Mother] testified at trial that both she and [Father] used crack cocaine 19 days ago. [Father] testified that he used it 4 days ago. The Court ordered both parents drug tested on the day of trial; both were positive for cocaine. Based on the high level of cocaine metabolite in [Father's] system, it appears that he used cocaine within the past 24 hours. At any rate both parents admitted that they used cocaine very recently. The Court finds that they have a long history of illegal drug use and that not only have they provided no proof of completing drug treatment, they continue to use crack cocaine even now. Consequently, the most serious reason that the children were placed in foster care continues to persist.

On the basis of these findings of fact, the trial court found, by clear and convincing evidence, that grounds for termination of the parental rights of both parents existed in that both had abandoned the children, both had failed to substantially comply with the statement of responsibilities in the permanency plans, and the conditions that led to removal of the children from the parents more than six months earlier still persisted and prevented the safe return of the children to the parents in the near future.

The court also found that termination of Mother's and Father's parental rights was in the best interests of the children on the basis of specific findings relating to the statutory list of factors to be considered. Relevant to best interests, the court further found by clear and convincing evidence that the children had resided in their current foster home for a total of 15 months, that the children were closely bonded to the foster parents and their children, and that the foster parents hoped to adopt these children.

Mother appeals the termination of her rights to both T.A.R. and D.F.R., and Father appeals the termination of his rights to D.F.R.[4]

---

[4]In Father's brief, his attorney states that after the hearing herein, Father instructed him to appeal if his rights were terminated. The attorney has followed Father's instruction even though the attorney has had no contact with Father since the day of the hearing.

## I. GROUNDS

A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence, that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann § 36-6-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The higher standard of proof, which serves to protect a parent's fundamental right to the care, custody, and control of his or her child, requires evidence that eliminates any serious or substantial doubt about the correctness of the conclusions to be drawn from it. *Id.* Clear and convincing evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the facts sought to be established; it should demonstrate that the truth of the facts asserted is "highly probable." *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2002).

In the case before us, the trial court found that three grounds for termination had been proved by clear and convincing evidence: (1) abandonment; (2) failure to substantially comply with the permanency plans; and (3) persistence of conditions that prevent safe return of the children to the parents' custody. The parents challenge the validity of the findings as to each ground for various reasons.

## A. PERSISTENCE OF CONDITIONS

The trial court found that the ground of persistence of conditions that prevent the children's safe return to the parents' home had been proved by clear and convincing evidence. That ground is set out in Tenn. Code Ann. § 36-1-113(g)(3)(A) and allows a trial court to terminate the parental rights if:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> > (I) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> >
> > (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> >
> > (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Under the clear language of the statute, the conditions which prevent the child's safe return to the home may be either (1) the conditions that led to removal or (2) other conditions likely to cause further neglect.

As a result of their arrest in 2001, Mother and Father pled guilty to child neglect of the two children who are the subject of this action. Mother served approximately five months for that crime. She later violated probation by failing to keep in contact with her probation officer. She avoided arrest for the probation violation for a while, but finally turned herself in and was incarcerated again from May 2003 until September 2003. Father admitted to having been incarcerated in October-November 2001 and for probation violation from January 2003 to April 2003.[5] As the trial court found, the parents' current living situation was of very recent origin. This lack of stability adversely impacts the ability of the children to return to the parents' custody.

As the trial court found, however, it is the parents' pattern of drug use that creates the most significant barrier to a safe return of the children. The children were originally removed from their custody in part because of drug paraphernalia. On the first permanency plan, which was signed by Mother and approved by the court, the reason given for the children's removal from their parents was the history of drug use by Mother and Father. At trial, both Mother and Father admitted to frequent drug use prior to the incident resulting in the removal of the children. Mother testified that they had quit drugs one month before their arrest. Father testified they were using drugs during that time.

The permanency plan requirements recognized that drug use was a serious barrier to returning the children to the parents and were designed to address the parents' drug problems. Nevertheless, Mother had a positive drug screen in June of 2002, and Father had a positive drug screen in July of 2002. At trial, both Mother and Father admitted to recent use of cocaine.[6] Mother testified she had quit using drugs on her birthday the year before, October 17, 2002. However, she testified she had used cocaine approximately three weeks before the trial. Father admitted to using cocaine at the same time with Mother and to using it again a few days before trial. The trial court found that the parents "have a long history of illegal drug use and that not only have they provided no proof of completing drug treatment, they continue to use crack cocaine even now. Consequently, the most serious reason that the children were placed in foster care continues to persist."

_____

[5]The probation violation resulted from charges brought by Father's employer that the trial court referred to as a pending theft charge.

[6]In its order, the trial court refers to the results of drug screens performed on the day of trial. The transcript reflects that the court ordered and arranged for such tests during a recess and that Father had to re-take his test after proof was over. The results were not discussed at the hearing, no written documentation of those results was entered into evidence at the hearing, and no testimony was taken regarding their interpretation. Nonetheless, copies of drug screen results for Mother and Father taken on the date of the trial, but reported a few days later, are found in the technical record. Because those results are not properly part of the record on appeal, this court cannot consider them. However, the trial court made it clear in its order that the trial day drug screen results were not integral to its ruling. Testimony from both Mother and Father establishes recent drug use by both of them.

We agree with the trial court's conclusions as to the seriousness of the continued drug use and the continuation of this condition that prevents the safe return of the children home. We affirm the trial court's holding that the existence of the ground set out in Tenn. Code Ann. §36-1-113(g)(3)(A) was proved by clear and convincing evidence.[7]

To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). Indeed, in this case, DCS has chosen to rest its position on the validity of the trial court's holding on the ground of persistence of conditions. The guardian *ad litem*, however, asserts that the trial court's holdings on the other two grounds must also be affirmed. In view of our Supreme Court's admonishment in *In the Matter of D.L.B.,* 118 S.W.3d at 367, that trial courts should make findings of fact and conclusions of law as to each ground alleged in order to avoid delay in a child's permanent placement, we will address the other two grounds found to exist by the trial court.

## B. ABANDONMENT

Abandonment, for purposes of termination of parental rights, means the willful failure to visit or willful failure to support, or make reasonable payments toward support, for a period of four consecutive months immediately preceding the filing of the termination petition. Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A). Although the trial court found that Mother and Father had abandoned their children on the basis of both failure to visit and failure to support, neither DCS nor the guardian *ad litem* argues that the failure to support finding should be upheld.[8] Consequently, we will not consider that ground.

That the failure to visit must be willful is both a statutory and constitutional requirement. *In re Swanson*, 2 S.W.3d 180 (Tenn. 1999). An element of intent must be applied. *In re D.L.B.*, 118 S.W.3d at 367. The concept of willfulness or intent is often the determining factor in whether the existence of that ground has been shown by clear and convincing evidence. *See, e.g., In re L.J.C., A.L.C., and J.R.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003) (holding that the record did not provide clear and convincing evidence that an indigent mother intended, rather than was simply unable, to pay child support); *In re A.D.A.*, 84 S.W.3d 592 (Tenn. Ct. App. 2002) (holding that the proof did not show that the mother's failure to visit was intentional rather than the result of a number of circumstances including DCS's placement of the child in another county).

---

[7]Both parents challenge the trial court's holding that this ground was proved by asserting (1) all the required statutory findings were not made, (2) specific findings of fact were not made, and/or (3) one specific finding (regarding the time the children lived with Foster Parents) was incorrect. Having fully reviewed the trial court's order and the record herein, we find these assertions by the parents are without merit.

[8]On appeal, DCS chose to rely only on the persistence of conditions ground. The guardian *ad litem* argued the parents had willfully failed to visit the children, but specifically stated he was not arguing that abandonment by willful failure to support could be sustained.

The question of intent or willfulness is fact specific and depends on the totality of circumstances.  It is a question of fact that the trial court is in the best position to make.  *In re D.L.B.*, 118 S.W.32d at 367.  However, those facts must be applied to a standard definition of willfulness.

> Willful conduct consists of acts or failure to act that are intentional or voluntary rather than accidental or inadvertent.  Conduct is "willful" if it is the product of free will rather than coercion.  Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

*In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003) (no Tenn. R. App. P. 11 application filed) (citations omitted).

The willful failure to visit must have occurred in the four consecutive months immediately preceding the filing of the petition to terminate that is before the court.  Tenn. Code Ann. § 36-1-102(1)(A)(i); *In re D.L.B.*, 118 S.W.3d at 366.

The evidence clearly established that from December, 2001, and July, 2002, Father and Mother attended almost all of the supervised visits that were arranged by DCS.  The parents attended 10 of 13 scheduled visits.  The last supervised visit occurred July 17, 2002.  The evidence also clearly shows that there were no visits between Mother and Father and the children after July 17, 2002, well over four months prior to the filing of the petition, and neither parent disputes that fact.

The parents and DCS differ somewhat in their explanations of the reasons for the failure to visit, all of which relates to the issue of willfulness.  Mother attributed the cessation of visits to DCS's unwillingness to "work with" the parents and give them information about "what we were supposed to do."  Both parents testified as to problems with communication from DCS, exacerbated by the fact that four different caseworkers were assigned to their case during the two years the children were in state custody.  Mother and Father both testified to many attempts to contact DCS and many messages left unreturned. They testified that they had left contact numbers and informed DCS of changes in contact information.  They were not informed of various developments, such as the children's placement with their aunt, permanency plan staffings and court hearings on the plans, and changes in their caseworkers.  Essentially, they blamed poor communication and lack of effort by DCS for their failure to visit the children after July of 2002.

DCS's only proof on these issues consisted of the testimony of Ms. Clegg, who had been the caseworker for these children for less than two months before the trial, *i.e.*, since September of 2003. Most of her testimony was based upon her review of the DCS records compiled by the three caseworkers who preceded her in the two years these children were in DCS's custody.  Ms. Clegg obviously had no personal knowledge of many of the relevant events testified to by the parents. None of the other caseworkers were called as witnesses.

Mother testified that after the last visit there had been confusion about the exact location (which McDonald's) of the visitation.  She stated that after July, 2002, there were three instances

where DCS took the children to the wrong location. After that, Mother testified, she continued to call DCS regularly, although she began to call less frequently.

At some point, another reason for the lack of visits developed. According to DCS records, Mother had had a positive drug screen in June of 2002 which was reported to DCS by Mother's probation officer. Father was given a drug screen the day of the last visit, July 17, 2002, and the results were positive for cocaine. At some point thereafter, DCS determined that a clean drug screen would be required for any future visitation. It is not clear how or when this pre-condition was communicated to Mother and Father. (Ms. Clegg testified that in 2002 further visits were conditioned on drug screens, but did not explain how the information was transmitted to the parents). However, both acknowledged they knew of this requirement sometime after the third missed visit, which occurred in September of 2002.

At some point, Mother learned there was an outstanding arrest warrant for her for violating her probation that was part of her sentence for child neglect. It is not clear whether DCS told Mother or she learned about the warrant some other way. In any event, Mother testified she was told by her DCS caseworker that to get visitation she needed to come to the DCS office and get a drug screen, but if she showed up there she would be arrested. Mother testified she did not want to be arrested, but wanted to turn herself in. Ms. Clegg testified that the records reflected that on October 22, 2002, Mother telephoned DCS and refused to visit because of the outstanding warrant for her arrest.

Mother also testified that the caseworker then assigned to them urged her to turn herself in and told her if she did so, she would just be getting done what she needed to get done. Mother also testified that this caseworker told her, a week before she surrendered herself, that DCS was not then considering terminating her rights. Father testified that on April 18, 2003, the day after he was released from jail, he went to the DCS office. He eventually met with a supervisor, Ms. Bell, who told him that Mother needed to turn herself in so that DCS would have an "outlet" within which to work with her.

Mother turned herself in on the probation violation warrant and began serving her sentence in May of 2003. Interestingly, the third set of permanency plans for the children was staffed April 16, 2003, apparently without notice to the parents, and those plans changed the single goal to reunification with the parents.

Meanwhile, Father had been incarcerated from January of 2003 until April 17, 2003, also on charges of violating his probation. Father testified that the day after his release he went to the DCS office, took a drug test, attempted to find out about the children, and tried to re-establish visitation. He met with Ms. Bell. He continued to call the DCS office regularly. He learned about a hearing scheduled for May 1 for the purpose of moving the children from their aunt's custody back to foster care. He went to that hearing and asked DCS representatives who were present about visitation. He continued to call and ask DCS for visitation in June. His efforts prompted the DCS caseworker to visit Mother, who had since been incarcerated in May, having turned herself on the outstanding

warrant. The DCS records reflected that a case manager visited Mother and reviewed the status of the case while Mother was incarcerated on June 17, 2003.

Mother testified she had not wanted the children to visit while she was in jail from May to September 2003, because there was a staph infection in the correctional facility.

In contrast to the specific testimony of the parents, Ms. Clegg testified that the main reason for the change in planning goals to adoption in the fourth permanency plan, prepared in September of 2003, was the lack of contact from the parents. She stated that, again according to DCS records, the last time, and the only time since April of 2003, that the parents contacted DCS was a telephone call from Father on June 2, 2003, and a caseworker visit to Mother in jail on July 17, 2003.

Father argues that any failure to visit on his part during the four months prior to May 30, 2003, was not willful since he was incarcerated from January of 2003 through April 17, 2003, and that upon his release, he immediately took steps to reinstate visitation. Similarly, the proof shows that Mother was jailed after she turned herself in in May of 2003, after encouragement from DCS caseworkers that such action would provide her the opportunity to do the things necessary for the return of her children. She remained incarcerated until September of 2003. Apparently, as of April 6, 2003, DCS did not consider the lack of visitation prior to that date to be an impediment to returning the children to the parents, as evidenced by the permanency plan prepared then.

As set out earlier, the ground at issue is defined as the willful failure to visit in the four consecutive months immediately preceding the filing of the petition. Tenn. Code Ann. § 36-1-102(1)(A)(i). That statute has been interpreted as referring to the petition to terminate that is before the court in the proceeding resulting in the termination order under appeal. *See In re D.L.B.*, 118 S.W.3d at 366. In the case before us, there were two petitions filed. The guardian *ad litem* filed the petition that initiated the proceeding on May 30, 2003. He alleged abandonment by willful failure to visit in the four month period immediately preceding the filing of his petition.

DCS filed an "Intervening Petition" on October 6, 2003, and alleged a willful failure to visit in the four months immediately preceding the filing of its petition. The trial court's final order states that the matter was heard upon both petitions to terminate. Pursuant to Tenn. Code Ann. § 36-1-113(h), where a party who has standing to bring a petition to terminate the parental rights of a child files such a petition, DCS must, in circumstances set out in the statute, or may not, in other enumerated circumstances, "seek to be joined as a party as a party to the petition." Whether DCS intended the "Intervening Petition" filed herein as seeking to be joined as a party is not clear.

This set of circumstances leads to questions regarding whether DCS's petition authorized the use of an additional four month period for determination of the ground of abandonment. We need not address those questions in this case, however, because DCS has not relied on the abandonment ground in this appeal and does not assert that visitation before October 6, 2003, must be considered in addition to or in the alternative to the four months before May 30, 2003. Additionally, the trial court order considered the four month period to be measured from the initial petition. No party has

challenged that ruling on appeal.[9]  Consequently, we conclude that in this case the guardian *ad litem*'s petition is the relevant one.[10]

An additional factor in pinpointing the correct four month period must be considered, however.  The statutory definition of abandonment applicable to termination of parental rights cases includes the situation where:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

Mother was incarcerated in May of 2003; consequently, the time period applicable to her failure to visit is the four months preceding that incarceration.  Father was incarcerated from January through part of April, 2003; therefore, the four month period applicable to him is September through December, 2002.

While it is clear there was no visitation during the relevant time period, or any of the other time periods that could have applied, the question is whether the failure to visit was willful.  The parents' testimony regarding the initial missed visits and their efforts to contact DCS to arrange visitation was not directly contradicted since the only evidence presented was Ms. Clegg's testimony based solely on records.  Having reviewed the entire record in this case, we conclude that willful failure to visit for the applicable time period was not proved by clear and convincing evidence.  We reverse the trial court's finding as to that ground.

### C. COMPLIANCE WITH PERMANENCY PLANS

The third ground for the termination of Mother's and Father's parental rights was failure to substantially comply with the Permanency Plans.  Tenn. Code Ann. § 36-1-113(g)(2).  The parents argue that DCS did not prove this ground by clear and convincing evidence.  To the contrary, they argue, they substantially complied with the Plans.

---

[9]The guardian *ad litem* actually argued that both periods should be used.  However, he did not argue that the trial court erred in using his petition as the one from which the four month period should be measured.

[10]Thus, while events occurring after May 30, 2003, may help explain DCS's decision to intervene and file its own petition in October of 2003, such events are not relevant to the ground of willful failure to visit during the four months immediately preceding the filing of the petition.

Prior to terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2), the trial court must find that the requirements of the permanency plan that the parent allegedly did not satisfy are "reasonable and are related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). Determining whether substantial noncompliance has been shown is a question of law that must also be reviewed without a presumption of correctness. *Id.* at 548.

In order for noncompliance to justify the termination of parental rights, it must be "substantial." *Id.* at 548. In other words, mere technical noncompliance alone is not sufficient to justify the termination of parental rights. *Id.* Noncompliance with requirements in a permanency plan that are neither reasonable nor related to remedying the conditions that led to the removal of the child from the parent's custody is not relevant for purposes of Tenn. Code Ann. § 36-1-113(g)(2). *Id.* at 548-49. Additionally, the parent's degree of noncompliance with a reasonable and related requirement must be assessed.

DCS prepared an initial permanency plan which was agreed to by Mother at a staffing on November 1, 2001. The initial plan had concurrent goals of return to the parents and relative placement. A second plan was staffed on September 30, 2002, but neither parent was present. This plan reflected the goals of relative placement or adoption. A third plan was staffed April 6, 2003, with neither parent present, which had the goal of return to the parents. A fourth plan was staffed on September 24, 2003, and reflected adoption as a goal. All the plans had the same statement of responsibilities for the parents.[11]

Mother used her time in jail to work on her permanency plan requirements. She completed a second parenting class, completed the first phase of a drug treatment program, which was all the length of her sentence would allow, and took some educational classes. Nonetheless, Ms. Clegg testified that in her opinion neither Mother nor Father had substantially complied with the requirements of the permanency plan. She based this opinion primarily on the fact that there was no certificate or other documentation in the file to show that either parent had completed a drug treatment program even though both had attended programs. Additionally, she relied on the failure of visitation, since visitation with the children 4-5 hours per month was a requirement of the plan.

---

[11]The only caseworker who testified, Ms. Clegg, became the caseworker in September of 2003, after the guardian *ad litem*'s petition had been filed. She prepared the fourth set of plans and changed the goal from return to the parents to adoption. The reason for the change was the lack of contact by the parents. Ms. Clegg testified that since development of the April 2003 third plan with the goal of reuniting the family, there had been only one contact each by the parents: a phone call from Father in June 2003 and a caseworker visit to Mother, who was incarcerated at the time, also in June 2003. Actually, because she was not the caseworker during that time and had no personal knowledge of the facts, she only testified that DCS's records did not reflect any other contacts. Of course, during most of this time, Mother was incarcerated, and DCS knew that since a prior caseworker had visited her. Mother was released in September of 2003. Neither Mother nor Father was given notice of the staffing for the fourth permanency plan, although Ms. Clegg testified she made efforts to locate them.

The parents were required to address their drug problem through several of the specific plan requirements: completion of a drug treatment program; compliance with recommendations from the program therapist; and random drug screens. Although both parents attended a drug treatment program, neither completed one. Their efforts to complete a program and to continue follow-up requirements to avoid relapse were non-existent to sporadic. While they underwent a few drug screens, there is no evidence they regularly submitted to them. It should be noted that those specific requirements were designed to ensure that Mother and Father stop using illegal drugs. That was the real goal, and parents understood they were expected to refrain from drug use. They did not.

We agree with the trial court that these requirements were reasonable and were related to the conditions that led to removal of the children and their continued placement in foster care. We also agree that clear and convincing evidence shows that Mother and Father failed to substantially comply with the requirements. The parents' drug use was the most serious barrier to their regaining custody of the children.

While Mother completed parenting classes and Father obtained stable employment, we cannot conclude these steps outweigh their failure to address the most serious problem that kept the children in state custody. Consequently, we affirm the trial court's holding that the ground of failure to substantially comply with the permanency plan requirements was proved by clear and convincing evidence.

## II. BEST INTERESTS

Since the removal from the parents' custody, the children have developed a relationship with a foster family, and Foster Parents want to adopt them. The children were placed with Foster Parents from June through December of 2002. The children then went to live with an aunt in Kentucky, but visited Foster Parents frequently. The children were returned to the Foster Parents' home in August of 2003, and remained there at the time of trial. T.A.R. and D.F.R. have become part of the family. Both children receive the health care, educational, and other services they need. When she first came into custody, T.A.R. was developmentally delayed in the areas of speech and motor skills. She has received needed services and has improved.

Among the factors to be considered in determining whether termination of parental rights is in the child's best interest are the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

-13-

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(I).

The trial court made specific findings as to the statutory factors, including specifically finding that Mother and Father had failed to make an adjustment of circumstances, conduct or conditions so as to make it safe for the children to return home; that lasting adjustment does not reasonably appear possible; that no meaningful relationship had been established between the parents and the children and the parents had not visited the children or maintained contact with them; that a change of caretakers would likely adversely affect the children; and that Mother and Father had continued to engage in criminal conduct. The evidence does not preponderate against the specific factual findings. Additional, the totality of these findings and other evidence regarding the children's wellbeing shows by clear and convincing evidence that termination of the parental rights of Mother and Father is in the best interest of T.A.R. and D.F.R. They are in a stable home where their needs are met, and they have the opportunity to have that situation made permanent through adoption by Foster Parents.

## III. CONCLUSION

Because there are statutory grounds for termination and such termination is in the best interest of the children, both having been shown by clear and convincing evidence, we affirm the judgment of the trial court terminating the parental rights of Mother and Father. Costs are taxed to Appellants.

_____
PATRICIA J. COTTRELL, JUDGE